## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | | |
|---|---|---|
| THE STATE OF NORTH CAROLINA, | ) | |
| *ex rel.* JOSHUA H. STEIN, | ) | |
| Attorney General, | ) | Case No.: 1:22-cv-00058 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT FOR INJUNCTIVE** |
| v. | ) | **RELIEF AND CIVIL PENALTIES** |
| | ) | |
| ARTICUL8, LLC; and PAUL K. | ) | |
| TALBOT, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

The State of North Carolina by and through its Attorney General Joshua H. Stein ("Attorney General" or "Plaintiff") brings this action against **ARTICUL8, LLC** and **PAUL K. TALBOT** pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6103(e), and North Carolina's Unfair or Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, *et seq.*, in order to obtain permanent injunctive relief, civil penalties, attorneys' fees, expenses, costs, and other appropriate relief, and alleges the following:

### INTRODUCTION

1.      Defendant Paul K. Talbot and his company, Defendant Articul8, LLC, routed millions of fraudulent and illegal telemarketing calls and robocalls that were delivered to

U.S. consumers, including consumers in the Middle District of North Carolina. Articul8 is a U.S.-based telephone service provider that serves as both a point of entry to the U.S. telephone network for calls that originate abroad and also as an intermediary for calls routed within the U.S. Articul8 allows scammers and fraudsters to access the U.S. telephone network and bombard U.S. consumers with fraudulent and illegal telemarketing calls and robocalls.

2. This deluge of fraudulent and illegal calls invades consumers' privacy, wastes and disrupts consumers' time, and results in consumers being scammed out of significant sums of money. It is estimated that phone scams cost U.S. consumers tens of billions of dollars every year.[1] In pre-recorded messages that often purport to be from federal government agencies and legitimate businesses, scammers tell call recipients that their social security number or other personal information has been compromised or connected to criminal activity; that they or their family members face imminent arrest; that their benefits are being stopped; that their utility services are being disconnected; and other similar lies. These scammers even manipulate the caller ID system so it appears that their calls originate from legitimate phone numbers—a practice known as "spoofing." When consumers answer the calls or return voicemail messages, the fraudsters tell recipients they must send money immediately to avoid imminent catastrophe.

---

[1] Truecaller Insights 2021 U.S. Spam and Scam Report, *available at* https://truecaller.blog/2021/06/28/us-spam-scam-report-21/.

2

3.     Because only a small percentage of recipients will fall for these scams, their success depends on the scammers' ability to bombard U.S. consumers with millions of these calls every day.  And this is where Defendants come in.  Scammers use Articul8's telephone network to gain access to the U.S. telephone system and to route their fraudulent and illegal calls to reach U.S. consumers.  Defendants, in turn, profit handsomely from these fraudulent schemes because they are paid based on the volume and duration of calls they route into and through the U.S. telephone system.  Because a high volume of calls is both essential to the success of these schemes and a source of Defendants' revenue, Defendants have an interest in continuing to facilitate these fraudulent schemes.  Since 2015, Defendants have assisted and enabled fraudsters and scammers to defraud countless victims, including victims in the Middle District of North Carolina.

4.     Defendants know that their network is used by scammers to route millions of illegal and fraudulent calls but have continued to assist and facilitate these fraudulent and illegal schemes.  Articul8's own call traffic exhibits the telltale signs of illegal and fraudulent robocall traffic, including millions of short-duration and unanswered calls routed through Articul8's network. What is more, Defendants received numerous written warnings that Articul8's network was responsible for routing millions of fraudulent and illegal telemarketing calls and robocalls.  Even with this specific knowledge, Defendants failed to take appropriate action to curb these abuses.  Instead, Defendants continued to assist, facilitate, and profit from the use of their services to defraud U.S. consumers.

Case 1:22-cv-00058-LCB-JLW   Document 1   Filed 01/25/22   Page 3 of 50

This lawsuit seeks to hold Defendants responsible for their knowing participation in these fraudulent and illegal schemes.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1355, the Telemarketing Act, 15 U.S.C. § 6103(e), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

6.     The Court has pendant jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and 1395(a), and 15 U.S.C. § 6103(e). A substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this district and in the State in which this district is located.

8.     Plaintiff has notified the Federal Trade Commission of this civil action prior to instituting such action, pursuant to 15 U.S.C. § 6103(b).

## PLAINTIFF

9.     Plaintiff is the State of North Carolina acting on relation of its Attorney General, Joshua H. Stein.  The Attorney General has the power, pursuant to N.C.G.S. § 75-9, to investigate the affairs of all corporations or persons doing business in the State of North Carolina and, pursuant to N.C.G.S. § 75-15, to prosecute such action in the name of the State, and to prosecute all officers, agents, or employees of such corporations.

4

10.     The Attorney General is charged with, *inter alia*, enforcing North Carolina's Unfair or Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, *et seq.*, which prohibits unfair or deceptive trade practices in or affecting North Carolina commerce.  For violations of the Act, the Attorney General is empowered to seek temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, attorneys' fees, expenses, costs, and other equitable relief for acts or practices in violation of N.C.G.S. § 75-1.1, and to obtain civil penalties of up to five thousand dollars ($5,000.00) for each violation of the Act committed knowingly or willfully.

11.     The Attorney General is also authorized by 15 U.S.C. § 6103(a) to file actions in federal district court to enjoin violations of, and enforce compliance with, the TSR on behalf of the residents of the State of North Carolina, and to obtain damages, restitution, or other compensation on behalf of North Carolina residents.

## DEFENDANTS

12.     Defendant Articul8, LLC ("Articul8") is a Delaware corporation with its principal place of business in Texas.

13.     Articul8 is an interconnected Voice over Internet Protocol ("VoIP") service provider, registered in the Federal Communications Commission's ("FCC") Form 499 Filer Database as Filer ID No. 833646.

5

14.    VoIP is a technology that allows users to make voice calls using a broadband internet connection instead of an analog phone line.

15.    As an interconnected VoIP service provider, Articul8 routes VoIP call traffic into and throughout the U.S., thereby allowing its customers to access and use the U.S. telephone network.

16.    Defendant Paul K. Talbot ("Talbot") is a resident of McKinney, Texas.

17.    Talbot is the founder, sole owner, chief executive officer, and majority member of Articul8.

18.    At all times relevant to this Complaint, Talbot is and has been the only employee of Articul8.

19.    At all times relevant to this Complaint, Talbot alone has directed the policies, procedures, actions, financial affairs, business practices, and day-to-day operations of Articul8.

20.    Talbot is also solely responsible for Articul8's legal compliance and is the sole signatory on Articul8's bank accounts.

21.    Articul8's 2020 FCC Form 499-A Telecommunications Reporting Annual Filing, dated 6 April 2020, was certified and signed under penalty of perjury by Talbot as Articul8's Chief Executive Officer.

22.    On Articul8's 2020 FCC Form 499-A, Talbot certified under penalty of perjury that Articul8 provides service to the jurisdictions of all U.S. states and territories,

6

including North Carolina.

23.    At all times relevant to this Complaint, Talbot had the sole authority and responsibility to control Articul8's acts and practices, and he had the authority to prevent or correct any unlawful acts or practices committed by Articul8, including those acts and practices set forth in this Complaint.

24.    As used throughout this Complaint, "Defendants" shall mean Articul8 and Talbot collectively.

## COMMERCE

25.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in N.C.G.S. § 75-1.1(b) and in Section 4 of the FTC Act, 15 U.S.C. § 44, in the Middle District of North Carolina and throughout North Carolina and the United States.

## OVERVIEW OF ROBOCALLS, ROBOCALL SCAMS, AND THE ROBOCALL TRACEBACK PROCESS

26.    Robocalling technology allows fraudsters to send millions of calls per day—all transmitting the same pre-recorded, fraudulent message—and enables fraudsters and scammers to cast a wide net for victims.  Elderly consumers are particularly susceptible to the threatening messages the fraudsters are sending.  Even if only a small percentage of the recipients of a fraudulent call center's robocalls connect with potential victims, the fraudsters can still reap huge profits from their schemes.

7

27.     These robocalls are often "spoofed" so that they falsely appear on a victim's caller ID to originate from U.S. federal government agency phone numbers (such as the Social Security Administration's main customer service number), local police departments, or the actual customer service phone numbers of legitimate U.S. businesses. These "spoofed" numbers are used to deliberately disguise the origin of the calls and the actual callers' identities, and to cloak the calls with the authority of government agencies or large businesses to induce potential victims to answer or return the calls. In reality, the calls originate from fraudsters, often operating abroad, and have no connection to any U.S. government agency, local law enforcement, or other legitimate enterprise.

28.     Individuals who answer or return these calls eventually speak to live scammers who tell these individuals lies intended to frighten and confuse them, often resulting in the scammers' obtaining money and/or personal information from them. Fraudsters may begin to control victim's behavior and isolate them from authorities, friends, and family members. Once the fraudsters are convinced they have extorted as much money as possible from the victim, they drop all contact, leaving the victim without meaningful recourse. Fraudsters typically receive victims' money through retail gift cards, bank wires, cash payments, cryptocurrency transfers, and other methods that can be difficult or impossible to trace.

29.     The fraudulent schemes that involve telemarketing calls and robocalls targeting consumers in the United States rely on VoIP and related technology to initiate

8

and route the calls. VoIP calls use a broadband Internet connection—as opposed to an analog phone line—to place telephone calls locally, over long distance, and internationally, without regard to whether the call recipient uses a cellular phone or a traditional, landline phone.

30. However, unlike the age-old children's game of playing telephone with two cans on either end of a string, actual voice calls are not transmitted directly from the caller on one end of the string to the call recipient on the other end of the string. The global telecommunications network is composed of thousands of providers, hundreds of which are involved in delivering calls within and to the United States. In order for calls to traverse the telecommunications network from calling party to call recipient, every call routed into and across the U.S. telephone system must travel through the networks of usually four or more—and possibly as many as nine or ten—service providers across the globe. The journey of a call is composed of "hops" along a "call path." Each service provider that accepts and routes a call along the call path is a "hop" in the call path or a "hop provider."

31. The person, call center, or telecommunications company that places a call is the "originating caller." An "originating provider" is the service provider that places a call for the originating caller. The originating caller and the originating provider can place calls to U.S. consumers from within the United States or from anywhere in the world.

32. The telemarketing and robocalling fraud schemes that originate overseas use U.S.-based telecommunications companies—referred to as "point-of-entry" or "gateway"

9

providers—to introduce the foreign call traffic into the U.S. telephone system. A foreign call center or telecommunications company that places VoIP calls to U.S. telephones must have a relationship with a U.S. gateway provider. After being accepted and routed from the gateway provider, most calls will pass through a series of U.S.-based VoIP providers— called "intermediate" or "downstream providers"—before reaching a "terminating provider" that delivers the call to a potential victim's phone. The provider that routes or hands off a call to an intermediate or downstream provider is referred to as its "upstream provider."

33. Defendants' role in these fraudulent schemes is to serve as both a gateway provider and an intermediate provider for the fraudulent telemarketing calls and robocalls. In other words, Defendants provide telemarketing and robocall scammers access to the U.S. telephone network and to U.S. consumers.

34. Every call accepted by and routed through a provider's telecommunications network automatically generates a record, known as a "call detail record" or "CDR," which includes the following information:

      a.     the date and time of the call;

      b.     the duration of the call;

      c.     the destination or called number for the intended call recipient;

      d.     the source number or calling number from which the call was placed, which may be a real number or may be a legitimately or

10

illegally spoofed number;

e.    the name of the upstream provider that sent the call to the provider; and

f.    the name of the downstream provider to which the provider sent or routed the call.

35.    Each provider has access to its own CDRs for all of the calls that pass through its network from all of its upstream and/or originating providers.

36.    CDRs are maintained for some period of time by every provider in order to, at a minimum, accurately bill an upstream provider for accepting and routing its call traffic.

37.    CDRs may also be used to review or audit a provider's call traffic, and to help trace the call path of a call in order to identify all service providers along the call path that accepted, routed, and ultimately helped deliver that call. The telecommunications industry refers to this process as a "traceback." A traceback begins with the call recipient's terminating provider and identifies every "hop provider" or upstream provider back "up" the call path that helped route and deliver the call, ultimately leading to the identification of the gateway provider and/or the originating provider and originating caller that was the source of the call. Tracebacks are used to seek out the source of suspicious, fraudulent, and illegal call traffic.

38.    Pursuant to Section 13(d)(1) of the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act or TRACED Act, signed into law on

December 30, 2019, Congress required the FCC to issue rules to establish a process for the registration of a single consortium that conducts private-led efforts to trace back the origin of suspected unlawful robocalls.

39.     On July 27, 2020, the FCC selected the USTelecom-led Industry Traceback Group ("USTelecom/ITG") as the single registered consortium to conduct private-led traceback efforts.

40.     Established in 2015, USTelecom/ITG is a private collaborative industry group—composed of providers across wireline, wireless, VOIP, and cable services—that traces and identifies the sources of illegal robocalls.

41.     USTelecom/ITG's traceback operations are managed by a team of employees and contractors who work daily with industry and government partners to identify sources of illegal robocalling campaigns.

42.     Every day, USTelecom/ITG traces back numerous examples of the most prolific ongoing illegal robocall campaigns in the United States, representing millions of illegal calls targeting U.S. consumers.  USTelecom/ITG provides notice to providers that are implicated in the call path for suspected and known fraudulent and/or illegal call traffic. USTelecom/ITG also shares information from those traceback investigations with federal and state enforcement agencies, which information supports law enforcement actions.[2]

---

[2]  Industry Traceback Group, *Working with the Industry Traceback Group*, https://tracebacks.org/for-government/.

## THE FEDERAL TRADE COMMISSION'S TELEMARKETING SALES RULE

43.     Congress directed the Federal Trade Commission ("FTC") to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108.

44.     The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

45.     Among other things, the 2003 amendments to the TSR established a National "Do Not Call" registry (the "DNC Registry" or "Registry") of consumers who do not wish to receive telemarketing calls. Consumers can register their telephone numbers on the Registry without charge.  The Registry is maintained by the FTC.

46.     The TSR defines "telemarketing" as a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

47.     In the context of telemarketing, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(x).

48.     The TSR prohibits sellers and telemarketers from making telephone calls to numbers on the DNC Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).

13

49.     When they make calls, sellers and telemarketers are required to transmit certain information to call recipients, including the sellers' or telemarketers' telephone numbers and, when made available by the telemarketer's provider, their names or caller ID information.  16 C.F.R. § 310.4(a)(8).

50.     Transmitting inaccurate caller ID information, or causing inaccurate caller ID information to be transmitted, is commonly called "spoofing."

51.     With limited exceptions, the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service. 16 C.F.R. § 310.4(b)(1)(v).  Calls delivering prerecorded messages are commonly called "robocalls."

52.     The TSR prohibits any seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, its affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

53.     It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any deceptive or abusive telemarketing practices. 16 C.F.R. § 310.3(b).  Persons who violate this provision of the TSR are said to have "assisted and facilitated" sellers or telemarketers.

14

54.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

55.     The Telemarketing Act further provides that when an attorney general of any State has reason to believe that the interests of the residents of that State have been or are being threatened or adversely affected because any person has engaged or is engaging in a pattern or practice of telemarketing that violates any rule of the FTC under 15 U.S.C. § 6102—which includes the TSR—the State, as *parens patriae*, may bring a civil action on behalf of its residents in an appropriate district court of the United States to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation on behalf of residents of such State, or to obtain such further and other relief as the court may deem appropriate.  15 U.S.C. § 6103(a).

## DEFENDANTS ASSISTED AND FACILITATED ILLEGAL AND FRAUDULENT TELEMARKETING CALLS AND ROBOCALLS

56.     Since at least 2018, Defendants have knowingly provided substantial assistance and support to U.S.- and foreign-based fraudsters operating telemarketing and robocall scams by accepting and routing calls into and through the U.S. telephone network by the millions, including into the Middle District of North Carolina.

15

57.     Articul8's call traffic shows patterns with the hallmarks of illegal and fraudulent telemarketing and robocall traffic.

58.     In the telecommunications industry, high volumes of short-duration and unanswered calls are among the analytics recognized as indicative of unwanted, fraudulent, or illegal call traffic.[3]

59.     High volumes of calls to phone numbers on the FCC's Do Not Call Registry is also indicative of fraudulent and illegal call traffic.[4]

60.     Additionally, legitimate robocall traffic typically originates from a small set of caller ID values or ANIs.[5]  For example, a legitimate telemarketer making 100,000 calls across five campaigns would typically use five different ANIs with an average of

---

[3] *See, e.g.*, FCC, *Advanced Methods to Target and Eliminate Unlawful Robocalls, Call Authentication Trust Anchor*, CG Docket No. 17-59, WC Docket No. 17-97, Declaratory Ruling and Third Further Notice of Proposed Rulemaking, 34 FCC Rcd 4876, 4888, ¶ 35 (2019) (*FCC Declaratory Ruling*), *available at* https://www.fcc.gov/document/fcc-affirms-robocall-blocking-default-protect-consumers-0 (identifying as among the examples of reasonable analytics that could be used to block unwanted calls: "large bursts of calls in a short timeframe; low average call duration; low call completion ratios; . . correlation of network data with data from regulators, consumers, and other carriers; and comparison of dialed numbers to the National Do Not Call Registry"); USTelecom, *Whitepaper:  How to Identify and Mitigate Illegal Robocalls*, 8 (Oct. 2019) (*USTelecom Whitepaper*), https://www.ustelecom.org/wp-content/uploads/2019/11/USTelecom-Whitepaper-Combating-Illegal-Robocalls.pdf (identifying as "telltale signs of illegal robocall traffic . . . high call volumes, low duration calls, sequential dialing patterns, and call volumes to telephone numbers on the FTC's Do Not Call list").

[4] *FCC Declaratory Ruling*, at 4888 ¶ 35; *USTelecom Whitepaper*, at 8.

[5] "ANI" means "Automatic Number Identification," and for the purposes of this Complaint, refers to the purported source number or calling number for the call.

16

20,000 calls per ANI. Among other things, using a single ANI for each campaign allows a legitimate telemarketer to track metrics associated with calling campaigns for different services or companies.

61. In contrast, fraudulent and illegal telemarketing and robocall campaigns often use high numbers of ANIs for their scam campaigns in order to circumvent detection and call blocking tools.[6] This corresponds to a low average Calls-Per-ANI, since each ANI is only used for a small number of total calls in the campaign.

62. Therefore, when a provider's call traffic consists of high volumes of short-duration and unanswered calls *and* also shows an average Calls-Per-ANI in the single digits, this is a strong indication that the call traffic is nefarious.

63. Defendants had access to Articul8's own automatically-generated CDRs that captured information about every call Articul8 accepted and routed into and across the U.S. telephone network.

64. With this information, Defendants knew, or consciously avoided knowing, that Articul8 regularly routed across its network millions of short-duration and unanswered calls with average Calls-Per-ANI in the single digits.

---

[6] *See* Reply Comments of ZipDX LLC, CG Docket No. 17-59, WC Docket No. 17-97, at 5, (filed Jan. 9, 2022), https://www.fcc.gov/ecfs/filing/10110850525078 (*ZipDX Comments*) (explaining that illegal robocallers "often use a huge number of different caller-ID values" in order to "deceive analytics engines and deceive the called party").

65.     For example, on a single day, across only *one* of its 18 downstream providers, Articul8 routed almost 17.3 million calls, 74% of which were not answered.  Of the 4.4 million calls that were answered, those calls had an average call duration of only 11 seconds; over 159,000 of these calls were placed to phone numbers with North Carolina area codes, including area codes within this district.  The average Calls-Per-ANI of these calls was 1.08, which means that almost every one of the over 4.4 million calls answered came from a distinct—and likely illegally spoofed—calling number.

66.     What is more, Defendants had actual notice from USTelecom/ITG—the USTelecom-led Industry Traceback Group selected by the FCC to conduct private-led traceback efforts—that Articul8 was routing high volumes of fraudulent and illegal call traffic.  USTelecom/ITG repeatedly notified Defendants that Articul8 had been identified in tracebacks of known fraudulent and illegal telemarketing and robocall campaigns.  Even after receiving these repeated notifications, Defendants failed to take significant action to mitigate Articul8's role in assisting and facilitating fraudsters and scammers targeting U.S. consumers.

67.     Because Articul8's CDRs show the ultimate destination number of every call it routes, Defendants knew, or consciously avoided knowing, that Articul8 was routing fraudulent and illegal calls that were delivered to potential victims in the Middle District of North Carolina.

18

68.     Defendants profited from these fraudulent practices because they are paid for the volume and duration of the calls Articul8 routes into and across the U.S. telephone network.

### Articul8's Call Traffic Shows Patterns with the Hallmarks of Illegal and Fraudulent Telemarketing and Robocall Traffic

69.     Defendants routed a significantly high volume of calls into and across the U.S. telephone system through Articul8's network.

70.     Between 1 July 2020 and 9 April 2021, Articul8 used two platforms to conduct its VoIP business: VeriSwitch and 46 Labs.

71.     Call detail records ("CDRs") show that Articul8 routed over 515.9 million attempted nationwide calls via VeriSwitch between 7 December 2020 and 30 April 2021, and routed over 91.5 million attempted nationwide calls via 46 Labs between 14 September 2020 and 14 January 2021.

72.     Articul8's upstream and downstream providers include the following:

    a.      All Access Telecom, Inc.;

    b.      Bare Telecom;

    c.      Clarity Networks Pty Ltd., an Australian corporation;

    d.      Crazy Networks Pty Ltd., an Australian corporation;

    e.      DIDCentral, LLC;

    f.      G4 Telecom, Inc.;

19

g.    Great Choice Telecom, LLC;

h.    HFA Services, LLC dba Call48;

i.    Inteliquent, Inc.;

j.    Mashunk Trading Corporation, a Philippines corporation;

k.    Matrix Telecom, LLC dba Impact Telecom;

l.    Matrix Telecom, LLC dba Lingo;

m.    PZ Telecommunication, LLC;

n.    USA Digital Communications, Inc.;

o.    VaultTel Solutions, LLC;

p.    Vibtree Technologies, LLC dba Trixcom Networks;

q.    VoIPShout Technologies, a Hong Kong corporation; and

r.    Whisl Telecom, LLC.

73.    Among Articul8's downstream providers, the following is a sampling of the volume of call traffic routed directly to these providers from Articul8:

a.    Bare Telecom produced CDRs for over 143.4 million attempted nationwide calls routed to their network directly from Articul8 between 17 November 2020 and 3 May 2021;

b.    Inteliquent, Inc. ("Inteliquent") produced CDRs for over 18.8 million attempted nationwide calls routed to their network directly from Articul8 between 24 February 2021 and 3 May 2021;

c.      Matrix Telecom, LLC dba Lingo ("Lingo") produced CDRs for over 74.8 million attempted nationwide calls routed to their network directly from Articul8 between 24 July 2020 and 29 January 2021;

d.      USA Digital Communications, Inc. ("USA Digital") produced CDRs for over 107.3 million attempted nationwide calls routed to their network directly from Articul8 between 18 September 2020 and 3 May 2021; and

e.      Whisl Telecom, LLC ("Whisl") produced CDRs for over 1.6 billion attempted nationwide calls routed to their network directly from Articul8 between 1 June 2020 and 3 May 2021.

74.      A preliminary review of several months' worth of CDRs from some of Articul8's downstream providers shows that Articul8 regularly routed high volumes of calls consistent with patterns of illegal and fraudulent call traffic to phone numbers with North Carolina area codes, including area codes within this district. For example:

a.      Between 17 November 2020 and 3 May 2021, Articul8 routed to Bare Telecom almost 3.4 million calls that were placed to over 1.74 million phone numbers with North Carolina area codes, including area codes within this district. Almost 3.2 million different calling numbers or ANIs were used to place those calls, and each ANI

21

was used for an average of only 1.07 calls to North Carolina telephone numbers. The average call duration was less than 11 seconds per call.

b.    Between 24 February 2021 and 3 May 2021, Articul8 routed to Inteliquent over 339,000 calls that were placed to over 116,900 phone numbers with North Carolina area codes, including area codes within this district. About 332,500 different ANIs were used to place those calls, and each ANI was used for an average of only 1.02 calls to North Carolina telephone numbers. The average call duration was only one second per call.

c.    Between 24 July 2020 and 29 January 2021, Articul8 routed to Lingo over 2.9 million calls that were placed to just under 725,500 phone numbers with North Carolina area codes, including area codes within this district. Over 1.9 million different ANIs were used to place those calls, and each ANI was used for an average of only 1.51 calls to North Carolina telephone numbers. The average call duration was less than 10 seconds per call.

d.    Between 7 December 2020 and 30 April 2021, Articul8 routed via VeriSwitch over 11.6 million calls that were placed to more than 4.8 million phone numbers with North Carolina area codes, including area codes within this district. Over 7.9 million different ANIs were

used to place those calls, and each ANI was used for an average of only 1.53 calls to North Carolina telephone numbers. The average call duration was less than 9 seconds per call.

e.    Between 14 September 2020 and 14 January 2021, Articul8 routed via 46 Labs over 3.4 million calls that were placed to more than 600,000 phone numbers with North Carolina area codes, including area codes within this district. Over 1.1 million different ANIs were used to place those calls, and each ANI was used for an average of only 2.96 calls to North Carolina telephone numbers. The average call duration was less than 9 seconds per call.

f.    Between 18 September 2020 and 3 May 2021, Articul8 routed to USA Digital over 1.7 million calls that were placed to more than 600,000 phone numbers with North Carolina area codes, including area codes within this district. Over 1.6 million different ANIs were used to place those calls, and each ANI was used for an average of only 1.24 calls to North Carolina telephone numbers. The average call duration was less than 12 seconds per call.

g.    Between 1 June 2020 and 3 May 2021, Articul8 routed to Whisl over 42.7 million calls that were placed to more than 8.4 million phone numbers with North Carolina area codes, including area codes within

23

this district. Over 23.4 million different ANIs were used to place those calls, and each ANI was used for an average of only 1.84 calls to North Carolina telephone numbers. The average call duration was less than 13 seconds per call.

75.    While a review of months of CDRs shows that Articul8 accepted and routed calls consistent with illegal and fraudulent call traffic, a review of *any* day of Articul8's regular call traffic also shows that Articul8 primarily—if not exclusively—routed high volumes of calls that are consistent with patterns of illegal and fraudulent call traffic.

76.    For instance, the patterns of Articul8's call traffic to two different providers on separate days indicate that each sample was almost exclusively non-conversational, short-duration, robocall traffic.

77.    On 1 December 2020, Articul8 routed over 4.4 million completed calls to Whisl; over 159,000 of those calls were placed to phone numbers with North Carolina area codes, including area codes within this district.

78.    Over 99% of the more than 4.4 million completed calls that Articul8 routed to Whisl on 1 December 2020 lasted less than 60 seconds, with the average call duration at only 11 seconds. Only 0.3% or just under 500 of the over 159,000 calls placed to phone numbers with North Carolina area codes lasted longer than two minutes. If this were typical conversational calling, the call traffic would likely have shown tens of thousands of calls lasting more than two minutes, rather than the 488 identified.

24

79.     Additionally, the average Calls-Per-ANI for the call traffic that Articul8 accepted and routed to North Carolina numbers through Whisl on this day was very close to 1 (1.03).  This means that almost every one of the over 159,000 calls placed to phone numbers with North Carolina area codes, which calls had an average call duration of only 10 seconds, had a unique caller ID number.

80.     On 22 April 2021, Articul8 routed over 5 million completed calls via VeriSwitch; over 57,000 of those calls were placed to phone numbers with North Carolina area codes, including area codes within this district.

81.     Just like the calls on 1 December 2020, 99.8% of the more than 5 million completed calls that Articul8 routed via VeriSwitch on 22 April 2021 lasted less than 60 seconds, with the average call duration of only 12 seconds.  Only 0.1% or just over 40 of the more than 57,000 calls placed to phone numbers with North Carolina area codes lasted longer than two minutes.  If this were typical conversational calling, the call traffic would likely have shown over ten thousand calls lasting more than two minutes, rather than the 42 identified.

82.     In addition, the average Calls-Per-ANI for the call traffic that Articul8 routed via VeriSwitch on this day to North Carolina numbers was also very close to 1 (1.04).  This means that almost every one of the more than 57,000 calls placed to phone numbers with North Carolina area codes, which calls had an average call duration of only 10 seconds, had a unique caller ID number.

25

83.     Moreover, 44% of the phone numbers with North Carolina area codes to which Articul8 routed these short-duration, single-use-ANI calls via VeriSwitch on 22 April 2021 were registered on the DNC Registry.

84.     Because the characteristics of these calls indicate that virtually all of them were placed using pre-recorded or automated messaging, under the TSR, they would have required consent from the called party. It is implausible that many, if any, of the consumers called consented to receiving these known fraudulent and illegal calls.

### *Defendants, through Articul8, Routed Known, Illegal Scam Calls to Victims in North Carolina*

85.     While an initial, conservative review of Articul8's call traffic shows that Articul8 accepted and routed millions of calls that were consistent with *patterns* signifying illegal and fraudulent call traffic, such a review also shows that Articul8 accepted and routed calls that are *specifically identifiable* as violative of federal and state law.

86.     For example, between 7 December 2020 and 7 June 2021, Articul8 routed via VeriSwitch over 3,000 calls to phone numbers with North Carolina area codes, including area codes within this district, which contained unlawful content, including unlawful and fraudulent call campaigns that were attributed to Social Security Administration scams.

26

87.     The following are transcripts of a small sample of the many unlawful and fraudulent campaigns that Articul8 routed to North Carolina area codes:[7]

    a.    Social Security Administration Imposter Scam:

*Attention. This is an emergency call from the Social Security Administration to notify you that your social security number is on the verge of being suspended as a law enforcement agencies have found some fraudulent and some suspicious activity involving your social to no more interconnect with the officer press one I repeat please press one.*

    b.    SSA/Arrest Warrant Scam:

*Activities from your banking account. Due to which there is a legal case being filed under your name and there is an arrest warrant being issued for the same in order to talk to an officer from law enforcement unit of federal reserve system.  Please press one and hold the line.*

    c.    Auto Warranty Scam:

*This is an urgent message for the vehicle owner. We've been trying to reach you about your cars extended warranty you should have received in the mail if your car's extended warranty since we have not gotten a response we are giving you a final courtesy call before we close out your file press two to be removed and be placed on our do not call list press one to speak with someone about possibly extending or reinstating your cars warranty press one to speak to a specialist now or call 800 number at 833-304-1447 U S T 456.*

    d.    Funding Department Scam:

*Hi this is Anna calling with the funding Department. I'm following up on an application one of our business loan representative sent you a*

---

[7] These call transcripts were identified through YouMail, and are publicly available at no cost on YouMail's website.  YouMail is a private company that offers its customers robocall blocking protection by capturing and monitoring voicemails received by its customers of known fraudulent and/or illegal scams.

27

*few weeks back for business line of credit. Our records indicate you have it yet to submit your application for approval. Please give us a call back as soon as possible to discuss the rates and terms for the line of credit. We can be reached toll free at.*

e.     Google Business Verify Scam:

*Hello, please don't hang up we've called numerous times to verify your business with google. Our records show that your business is not verified press one now. So we can verify your business with google. If you are the business owner press one now if your account is not verify the customers searching for your Services on google will not find your listing press one now to verify your listing press two to be removed from this list.*

f.     Computer Security Renewal Scam:

*It's for the renewal of your computer securities and services. if you want to continue computer service press one and cancel the payment and talk to our executive then please press nine. Thank you.*

g.     Amazon Imposter Scam:

*Hi this is a call from Amazon to inform you that your Amazon account will be auto renew was $129.99 from your bank account so enjoy using Amazon prime services or if you want to discontinue or unsubscribe the services and speak to the Amazon service manager by pressing the one.*

h.     IP Compromise Scam:

*Get in touch with you. However we will be disconnecting your license within 48 hours as your IP address has been compromised from several countries. So we need to change your IP address and license key. So please press one to get connected to the technician.*

i.     Monthly Bill Scam:

*Dropping down their monthly bills. So if you're not happy with bills and wanna lower your bills. Press one if you want to be taken off the*

28

*list press two. If you wanna speak with one of our promotional specialist please press zero.*

88.     Between 1 June 2020 and 3 May 2021, of the over 42.7 million calls that Articul8 routed through Whisl to phone numbers with North Carolina area codes— including area codes within this district—15.2 million were placed to numbers on the DNC Registry.  At least hundreds of thousands of those calls were unlawful and fraudulent Social Security Administration scam calls.

89.     Additionally, the calls routed by Articul8 relentlessly harassed consumers. For example, in the ten-month period referenced above for Articul8's call traffic routed to Whisl, at least 2,500 North Carolina phone numbers that were on the DNC Registry received more than 100 calls each.  Ninety of those North Carolina phone numbers received more than 400 calls each, with some numbers receiving over 1,000 calls each.  Some North Carolina numbers received between 50 and 200 calls *on a single day*.

### Traceback Notices Issued to Articul8 Provided Actual Notice to Defendants of Fraudulent and Illegal Call Traffic that Articul8 was Carrying on its Network

90.     Articul8 was repeatedly informed in writing by USTelecom/ITG that it has been either the gateway provider or intermediate provider for fraudulent or illegal telephone calls.

91.     Specifically, according to USTelecom/ITG, between June 2020 and March 2021, Articul8 appeared in the call path of at least 49 tracebacks related to "suspicious activity."   "Suspicious activity" is "a pattern of voice calls that have

29

characteristics associated with abusive, unlawful, or fraudulent practices (including, but not limited to, lack of header information, volumetric anomalies, calling or called party information modification, complaints received from called parties, law enforcement, third-party aggregators, or call transcripts)." [8]

92.     Each traceback itself represents, at a minimum, thousands[9] of illegal or fraudulent calls that Articul8 accepted and routed through its network and across the United States.

93.     For each of the 49 tracebacks in which Articul8 appeared in the call path during this time period, USTelecom/ITG sent a separate electronic written notice to Articul8.

94.     Each one of these 49 notices informed Articul8 that it was facilitating suspicious call traffic and requested that Articul8 "identify the source of this potentially fraudulent, abusive or unlawful network traffic" and take appropriate action to stop it.

---

[8] USTelecom, *Industry Traceback Group Policies and Procedures*, at 5 (revised July 2021) (*ITG Policies & Procedures*), *available at* https://tracebacks.org/wp-content/uploads/2021/08/ITG_Policies-and-Procedures_2021.pdf.

[9] *See, e.g.*, Letter from Joshua M. Bercu, Vice President, Policy & Advocacy, USTelecom, and Jessica Thompson, Director, Policy & Traceback Operations, USTelecom, to Marlene Dortch, Secretary, FCC, EB Docket No. 20-195, at 1 (filed Nov. 15, 2021), https://www.fcc.gov/ecfs/filing/111572802120 ("Since January 2021, the ITG has initiated nearly 2,900 tracebacks, representing hundreds of millions of illegal robocalls."); Industry Traceback Group, *Combatting Illegal Robocalls*, (2020), https://www.ustelecom.org/research/combatting-illegal-robocalls/; *ITG Policies & Procedures* at 4 (noting that a single robocall campaign "often represents hundreds of thousands or millions of calls").

95. Notices issued by USTelecom/ITG to Articul8 during this ten-month period also provided a link to USTelecom/ITG's web-based traceback portal. In the portal, providers that have received a traceback notice can access additional information about the specific fraudulent call at issue, including a recording of the fraudulent message and whether the provider was an originating, gateway, or intermediate provider for the traced call.

96. The following verbatim campaign descriptions were among those that repeatedly appeared in the notices for the tracebacks issued to Articul8 by USTelecom/ITG between June 2020 and March 2021:

     a. FRAUD. Recorded message says SSN is suspended due to fraud in Texas or other state. Caller fraudulently claims to be from SSA. Spoofed caller-ID using random wireless and other USA subscriber numbers.

     b. Likely FRAUD. Recorded message says your electric service will be disconnected in 30 minutes; press 1 to make payment arrangements. Utility company is not always identified. Assorted toll-free or other numbers used as caller-ID.

31

c.      Urgent. Active TDoS attack[10] affecting major hospital, disrupting emergency room lines.

d.      Captured recordings suggest these calls are perpetrating a SERIOUS FRAUD. Caller is impersonating a federal official. Automated message threatens that social security benefits will be canceled. Caller-ID appears to be a random toll-free number. Called party is asked to press 1 to speak to an agent. Caller-ID is random (different on each call) so blocking the ANI is not effective. **This call is just one example representative of millions of similar calls.** [(Emphasis added.)] Originators please search your records for similar traffic.

e.      Pre-recorded message offering full debt forgiveness. Automated calls to wireless numbers generally not permitted. Message captured in voice-mail does not identify the calling entity, nor does it offer instructions for opt-out. No toll-free call back number provided.

f.      Caller identifies themselves as calling on behalf of Apple and claims the called party's iCloud account has been breached.

---

[10] A Telephony Denial of Service or "TDoS" attack is an intentional attack on the telephony/voice service communications system of an organization intended to disrupt service by flooding the network with multiple and malicious simultaneous inbound calls. A TDoS attack can be made against private business or public-safety response systems (also known as "PSAPs" or public safety answering points) such as 911 centers, police departments, and hospitals.

32

g. FRAUD. Recorded message says SSN is suspended due to law enforcement action. Caller fraudulently claims to be from SSA. Spoofed caller-ID using random wireless and other USA subscriber numbers.

h. These calls fraudulently claim to be from US Social Security Administration, threatening problems with SS account. Calling number may be a spoofed toll-free number, or a call-back number. These incidents may be from separate campaigns.

i. Perpetrator, posing as a DHS official, contacted a potential victim and attempted to obtain personal information (SSN, etc.).

j. FRAUD. Automated voice offering zero percent interest rate, identified as the alert system with Visa MasterCard Account Services. Caller ID is spoofed with a random NPA so blocking the ANI is not effective. Many caller-IDs are invalid. Millions of calls daily. Calls are illegal because they are automated calls to mobiles, they use improper caller-ID, they do not identify the caller at the beginning of the message, they do not give an operable call-back number. **This call is just one example of millions of similar calls.** [(Emphasis added.)] Originators please search your records for similar traffic and address with your customer.

33

97.     Six of Articul8's upstream providers were identified in the tracebacks as the providers that sent the fraudulent, illegal, and/or suspicious call traffic to and through Articul8.  In other words, the calls routed by Articul8 that were associated with the suspicious, fraudulent, and/or illegal campaigns that were the subject of the traceback investigations did not come from just one "bad apple" provider from which Articul8 accepted call traffic on one isolated day; rather, more than a handful of the upstream providers from which Articul8 regularly accepted call traffic were originating or routing these fraudulent and illegal calls.

98.     Articul8 was identified as the gateway or point-of-entry provider for half of these tracebacks, including the TDoS attack on a hospital emergency room.  In other words, Articul8 was identified as the U.S.-based voice service provider that brought at least tens of thousands of fraudulent and/or illegal calls into the United States and onto the U.S. telephone network, which calls were then delivered to consumers in this district and throughout the United States.

99.     Articul8 was also identified as the immediate downstream provider to the originating provider for about half of these tracebacks.  In other words, Articul8 was identified as the U.S.-based voice service provider that accepted and routed at least tens of thousands of fraudulent and/or illegal calls from an originating provider that initiated fraudulent and/or illegal calls for a robocaller.

34

100.    On 14 December 2020, USTelecom/ITG issued a written notice sent with high priority to Defendants with the following subject line: "URGENT: PERSISTENT TRACEBACKS ESCALATION NOTICE." This notice provided, in relevant part:

> In the majority of the past several weeks, you have been identified in Industry Traceback Group (ITG) tracebacks as carrying fraudulent robocalls directed to United States telephone subscribers. You are one of the larger contributors to the illegal robocalling problem based on information available to the ITG.
>
> . . . .
>
> Persistent tracebacks identifying your network as the source of illegal robocalls into the U.S. indicates that the actions you have taken so far appear to be insufficient to protect the U.S. network from illegal robocalls. Responding to a traceback by blocking a particular source number, or even refusing service to the offending customer, alone is not enough if within days new numbers or new customers continue to utilize your network for illegal robocalling.
>
> We ask that you promptly adopt additional measures to stop the flow of these calls, and we are committed to helping you do so.

101.    According to USTelecom/ITG, in its history of issuing such notices to any of the 874 voice service providers in its traceback portal, only about 30 providers had been issued urgent escalation notices like the one issued to Articul8 in December 2020.

102.    Yet, despite actual notice of fraud from USTelecom/ITG related to tracebacks of a variety of different known telemarketing and robocalling fraud scams, Articul8 continued to regularly route huge volumes of fraudulent telemarketing calls and robocalls across the United States and into this district.

35

***Patterns of Illegal and Fraudulent Calls Identified in Articul8's Call
Traffic Related to Traceback Notices Provided Additional Notice to
Defendants that they were Assisting and Facilitating Illegal and
Fraudulent Call Traffic***

103.    Not only did Articul8 receive actual notice from USTelecom/ITG about
suspicious, fraudulent, and illegal call traffic that it was routing into and across the United
States, but Articul8 received notice of the same during an investigation conducted by the
Social Security Administration's Office of the Inspector General ("SSA/OIG").

104.    In July 2020, SSA/OIG began investigating whether Articul8 had business
relationships with individuals or entities that engaged in fraudulent Social Security
Administration-related imposter phone communications using Defendants' telecom
systems.

105.    On 1 February 2021, SSA/OIG issued a subpoena duces tecum to
Defendants.

106.    SSA/OIG directed Articul8 to identify the upstream provider(s) responsible
for sending fraudulent Social Security Administration impersonation or threat scam call
traffic to Articul8's network and compelled the production of information about its call
volume and call detail records for five specific dates.  These were dates on and around
which Articul8 was identified in tracebacks by USTelecom/ITG to be actively accepting
and routing known fraudulent Social Security Administration impersonation or threat scam
call traffic from "PZ/Illum Telecommunication."

36

107. PZ Telecommunication LLC and Illum Telecommunication Limited are interconnected VoIP service providers. The chief executive officer for both entities is Prince Anand of Ahmedabad, India.

108. According to a report prepared by SSA/OIG in April 2021, SSA/OIG analyzed two of the five days of CDRs requested of Articul8: 27 October 2020 and 14 January 2021.

109. On 27 October 2020, Articul8 accepted and routed nearly 11 million total calls from all of its upstream providers; over 4.7 million of those calls were accepted and routed directly from and for PZ/Illum. Among the millions of calls that Articul8 attempted to forward for PZ/Illum, 94% of these attempts were 6 seconds or fewer. Over 62,000 of the calls Articul8 routed on this date were to phone numbers with North Carolina area codes, including area codes within this district.

110. On 27 October 2020, Articul8 made almost 7,200 attempts to route calls for PZ/Illum that used calling numbers associated with known fraudulent and/or illegal telemarketing and robocall scams.

111. The following is a transcription[11] of the message for one of these scam calls:

> *Asked him or we have detected a suspicious activity on your Amazon account and an authorized purchase of iPhone 764 g.b. has been ordered from your*

---

[11] SSA/OIG checked calling numbers or ANIs against databases on publicly-accessible websites from YouMail (https://directory.youmail.com/) and Nomorobo (https://nomorobo.com/lookup/). Like YouMail, Nomorobo is a private company that offers its customers robocall blocking protection by capturing and monitoring voicemails received by its customers of known fraudulent and/or illegal scams.

37

*Amazon account if you didn't place the order and wish to cancel the order and connect with one of our Customer Support Representative call us back on our toll free number 13132175121.*

112. The 27 October 2020 CDRs also identified five spoofed or likely spoofed calling numbers or ANIs that are associated with the following federal and state law enforcement agencies:

      a.      Bureau of Alcohol, Tobacco, Firearms, and Explosives; and

      b.      Ahoskie Police Department in Hertford County, North Carolina.

113. On 14 January 2021, Articul8 accepted and routed over 14.7 million total calls from all of its upstream providers; over 8.5 million of those calls were accepted and routed directly from and for PZ/Illum. Among the millions of calls that Articul8 attempted to forward for PZ/Illum, 96% of these attempts were 6 seconds or fewer. Over 136,000 of the calls Articul8 routed on this date were to phone numbers with North Carolina area codes, including area codes within this district.

114. The 14 January 2021 CDRs identified 262 spoofed or likely spoofed numbers or ANIs, some of which are associated with private sector entities like Federal Express and financial institutions, and others of which are associated with the following federal and state law enforcement agencies:

      a.      Social Security Administration (accounting for 16 of the spoofed numbers);

      b.      Bureau of Alcohol, Tobacco, Firearms, and Explosives;

38

       c.       Federal Bureau of Investigations;

       d.       United States Secret Service;

       e.       New York Police Department; and

       f.       many other local police departments.

115.    These two days of CDRs showed that Articul8 routed calls into and across the United States that used illegally spoofed ANIs to deliberately disguise call traffic that originated outside the United States as legitimate call traffic from local, state, and federal government agencies within the United States.

116.    Further, after receiving a subpoena from SSA/OIG on 1 February 2021 and engaging in ongoing discussions with SSA/OIG between 3 February 2021 and 16 April 2021 regarding its role in assisting and facilitating the routing of illegal and fraudulent SSA impostor scam robocalls, Articul8 was notified by USTelecom/ITG that, between 15 March 2021 and 26 March 2021, it was identified in six additional traceback incidents as *still* routing illegal SSA impostor scam robocalls directly from the provider that was originating those calls.

### *Review of Defendants' Wrongdoing*

117.    As described in detail herein, Articul8's call traffic shows that virtually all of Articul8's daily call traffic is marked with the characteristics of unwanted and fraudulent or illegal calls made without the consent of the call recipients, including high volumes and high percentages of short-duration and unanswered call traffic, and transmission of calls

39

using high volumes of unique, single-use caller ID numbers.

118.    Articul8 has routed millions of fraudulent and/or illegal telemarketing calls and robocalls into the U.S., including at least hundreds of thousands to the State of North Carolina and into this district, and has collected revenue as a result of the routing of those fraudulent and illegal calls.

119.    Illegal and fraudulent calls trafficked by Articul8 were also regularly made to numbers on the DNC Registry.

120.    Calls trafficked by Articul8 used millions of different calling number values or ANIs, which is a practice that is consistent with illegal number spoofing.

121.    Calls trafficked by Articul8 used spoofed numbers associated with the Social Security Administration, private sector phone numbers including, but not limited to, Federal Express and various financial institutions, as well as law enforcement entities including:  the Federal Bureau of Investigations; the Bureau of Alcohol, Tobacco, Firearms and Explosives; the U.S. Secret Service; the New York Police Department; and other local police departments including the Ahoskie Police Department in Ahoskie, North Carolina.

122.    Despite explicit warnings from USTelecom/ITG that it was identified as "one of the larger contributors to the illegal robocalling problem," Articul8 continued to serve as a gateway or intermediate provider for fraudulent and illegal telemarketing and robocall traffic, as indicated by Articul8's continued appearances in USTelecom/ITG's tracebacks.

40

123. Further, while purporting to be cooperating with SSA/OIG's investigation, Articul8 nevertheless continued its knowing participation in assisting and facilitating illegal and fraudulent SSA impostor scam robocalls and other fraudulent and illegal call traffic.

124. Thus, despite being fully informed of its active participation in multiple illegal scam robocall violations from both USTelecom/ITG and SSA/OIG, Defendants engaged in a pattern and practice of knowingly continuing to assist and facilitate further violations of the TSR.

125. Defendants' facilitation of each fraudulent or illegal call is itself a violation of the TSR.

## **CONSUMER HARM**

126. Consumers across the United States, including within this Court's district, have suffered and will continue to suffer injury as a result of Defendants' violations of the TSR and North Carolina state law.

127. In addition to the massive cumulative effect of these fraudulent telemarketing and robocall schemes on victims throughout the United States, the harm can be devastating to individual victims. Victims have faced terrifying threats from fraudsters impersonating government officials and have lost substantial sums of money.

128. Moreover, Defendants have been unjustly enriched as a result of their unlawful acts or practices.

41

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### COUNT I: ASSISTING AND FACILITATING DNC REGISTRY VIOLATIONS OF THE TSR

129.     Plaintiff incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

130.     Defendants, in numerous instances, have provided substantial assistance or support, through the provision of Articul8's services, to one or more sellers or telemarketers who Defendants knew or consciously avoided knowing were engaged in abusive telemarketing acts or practices that violated 16 C.F.R. § 310.4(b)(1)(iii)(B) by initiating or causing the initiation of outbound telephone calls to telephone numbers on the DNC Registry to induce the purchase of goods or services.

131.     Defendants' acts or practices, as described in paragraph 130 above, were themselves deceptive telemarketing acts or practices in violation of the TSR, 16 C.F.R. § 310.3(b).

### COUNT II: ASSISTING AND FACILITATING ROBOCALL VIOLATIONS OF THE TSR

132.     Plaintiff incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

133.     Defendants, in numerous instances, have provided substantial assistance or support, through the provision of Articul8's services, to one or more sellers or telemarketers who Defendants knew or consciously avoided knowing were engaged in

42

abusive telemarketing acts or practices that violated 16 C.F.R. § 310.4(b)(1)(v) by initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages or robocalls to induce the purchase of goods or services without the seller having obtained from the recipient of the call an express agreement in writing in accordance with the requirements set out that provision.

134.    Defendants' acts or practices, as described in paragraph 133 above, were themselves deceptive telemarketing acts or practices in violation of the TSR, 16 C.F.R. § 310.3(b).

## COUNT III: ASSISTING AND FACILITATING SPOOFING VIOLATIONS OF THE TSR

135.    Plaintiff incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

136.    Defendants, in numerous instances, have provided substantial assistance or support, through the provision of Articul8's services, to one or more sellers or telemarketers who Defendants knew or consciously avoided knowing were engaged in abusive telemarketing acts or practices that violated 16 C.F.R. § 310.4(a)(8) by failing to transmit or cause to be transmitted to caller identification services the telephone number and name of the telemarketer making the call, or the customer service number and name of the seller on whose behalf the telemarketer called.

137.    Defendants' acts or practices, as described in paragraph 136 above, were themselves deceptive telemarketing acts or practices in violation of the TSR, 16 C.F.R.

43

§ 310.3(b).

## COUNT IV: ASSISTING AND FACILITATING GOVERNMENT IMPOSTER VIOLATIONS OF THE TSR

138.    Plaintiff incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

139.    Defendants, in numerous instances, have provided substantial assistance or support, through the provision of Articul8's services, to one or more sellers or telemarketers who Defendants knew or consciously avoided knowing were engaged in prohibited deceptive telemarketing acts or practices that violated 16 C.F.R. § 310.3(a)(2)(vii) by misrepresenting, directly or by implication, in the sale of goods or services, a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

140.    Defendants' acts or practices, as described in paragraph 139 above, were themselves deceptive telemarketing acts or practices in violation of the TSR, 16 C.F.R. § 310.3(b).

## <u>VIOLATIONS OF NORTH CAROLINA STATE LAW</u>

141.    N.C.G.S. § 75-1.1 prohibits "unfair or deceptive acts or practices in or affecting commerce."

142.    Under N.C.G.S. § 75-1.1, a practice or act is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required.

44

143.    Acts or practices are unfair under N.C.G.S. § 75-1.1 when they offend established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

144.    Although Plaintiff has alleged herein that consumers have been harmed by Defendants' actions, proof of actual harm is not required in an action brought under N.C.G.S. § 75-1.1 by the Attorney General.

## COUNT V:  VIOLATIONS OF NORTH CAROLINA'S UNFAIR OR DECEPTIVE TRADE PRACTICES ACT

145.    Plaintiff incorporates and realleges each of the foregoing paragraphs as if fully set forth herein.

146.    Defendants' acts or practices enumerated in the foregoing paragraphs and in Counts I through IV have been in or affecting commerce.

147.    As alleged herein, the calls that Defendants routed across the U.S. telephone network possessed the tendency or capacity to mislead or created the likelihood of deception.

148.    Defendants' acts or practices enumerated in the foregoing paragraphs and in Counts I through IV are offensive to established North Carolina public policy, as well as immoral, unethical, oppressive, unscrupulous, and substantially injurious to North Carolina consumers across this State and within this district.

149.    As alleged herein, Defendants have devised and carried out the above-described business practices knowingly and deliberately.

45

150.    As set out in Counts I through IV above, Defendants, in numerous instances, have provided substantial assistance or support, through the provision of Articul8's services, to one or more sellers or telemarketers who Defendants knew or should have known were engaged in the following deceptive or abusive telemarketing acts or practices:

a.    initiating or causing the initiation of outbound telephone calls to telephone numbers on the DNC Registry to induce the purchase of goods or services in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B);

b.    initiating or causing the initiation of outbound telephone calls that delivered prerecorded messages or robocalls to induce the purchase of goods or services without the seller having obtained from the recipient of the call a written express agreement in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v);

c.    failing to transmit or causing to be transmitted to caller identification services the telephone number and name of the telemarketer making the call, or the customer service number and name of the seller on whose behalf the telemarketer called in violation of the TSR, 16 C.F.R. § 310.4(a)(8); and

d.    misrepresenting, directly or by implication, in the sale of goods or services, a seller's or telemarketer's affiliation with, or endorsement

46

or sponsorship by, any person or government entity in violation of the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

151.    Defendants' acts or practices enumerated in the paragraphs above and in Counts I through IV, were deceptive telemarketing acts or practices in violation of the TSR. 16 C.F.R. § 310.3(b).

152.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

153.    Defendants' acts or practices that are unfair or deceptive trade practices under the TSR and FTC Act are also deceptive or misleading and constitute unfair or deceptive trade practices prohibited by N.C.G.S. § 75-1.1, and are violations of North Carolina's Unfair or Deceptive Trade Practices Act.

154.    Plaintiff alleges that the acts, practices, representations and omissions of Defendants described herein violate the prohibition against unfair or deceptive business practices found in Section 75-1.1 of the North Carolina General Statutes. Plaintiff is therefore entitled to the statutory relief prayed for below.

47

## THIS COURT'S POWER TO GRANT RELIEF

155.   The TSR is a rule promulgated under the FTC's Telemarketing Act.

156.   When bringing an action pursuant to the authority granted under 15 U.S.C. § 6103(a), an attorney general of any State may enforce compliance with any rule of the FTC to obtain damages, restitution, or other compensation on behalf of residents of such State, or to obtain such further and other relief as the Court may deem appropriate.

157.   Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff to enforce its state law claims against Defendants in this Court and to grant such relief as provided under state law.

158.   Pursuant to N.C.G.S. §§ 75-14 through 75-16.1, a court is authorized to grant relief including injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, the disgorgement of ill-gotten monies, removal of officers and directors, civil penalties, attorneys' fees, expenses, costs, and such other relief to which Plaintiff may be entitled.

## PRAYER FOR RELIEF

**WHEREFORE, PLAINTIFF RESPECTFULLY PRAYS THE COURT** for the following relief:

A.    Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint or which may be shown through discovery or proven at the trial of this matter;

B.    Enter a permanent injunction to prevent future violations by Defendants of the TSR and of North Carolina's Unfair or Deceptive Trade Practices Act, pursuant to 15 U.S.C. § 6103(a) and N.C.G.S. § 75-14;

C.    Award Plaintiff State of North Carolina such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the TSR and of North Carolina's Unfair or Deceptive Trade Practices Act, including disgorgement and other relief that may be appropriate under 15 U.S.C. § 6103(a) and N.C.G.S. § 75-15.1;

D.    Impose civil penalties of up to $5,000.00 for each of Defendants' acts or practices that were knowingly violative of North Carolina's Unfair or Deceptive Trade Practices Act, pursuant to N.C.G.S. § 75-15.2;

E.    Award Plaintiff reasonable attorneys' fees and costs incurred by the investigation and litigation of this matter, pursuant to N.C.G.S. § 75-16.1; and

49

F.   Award Plaintiff any such other and additional relief as the Court may deem to be

appropriate, just, and proper.


Respectfully Submitted,
On this 25th day of January, 2022,


JOSHUA H. STEIN
Attorney General for the State of North Carolina


 /s/ Tracy Nayer
TRACY NAYER
Special Deputy Attorney General
North Carolina State Bar No. 36964
tnayer@ncdoj.gov

BRIAN D. RABINOVITZ
Special Deputy Attorney General
North Carolina State Bar No. 41538
BRabinovitz@ncdoj.gov

North Carolina Department of Justice
Consumer Protection Division
P.O. Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6000
Facsimile: (919) 716-6050

*Attorneys for the State of North Carolina*